IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 09-1539-TUC-DCB(HCE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Santiago Arballo-Villa, | |
| Defendant. | |

Defendant Santiago Arballo-Villa filed a Motion to Suppress Statement (*Miranda* violation) (Doc. 98). Defendant argues that he invoked his right to remain silent during his interview with the Government's agent and all statements made thereafter should be suppressed. The Government filed a Response In Opposition to Defendant's Motion to Suppress Statement (Doc. 101). This matter came on for hearing on August 24, 2010. Border Patrol Agent Shannon McCormick (hereinafter "BPA McCormick") testified (hereinafter "McCormick at p. _") for the Government.

Transcript of the August 24, 2010 evidentiary hearing was ordered by the Magistrate Judge, filed on September 1, 2010 (Doc. 111), and is forwarded to the District Court for review.

Three exhibits were admitted into evidence: (1) Government Exhibit 1: Spanish-language *Miranda* rights form (hereinafter "Exh. 1"); (2) Government Exhibit 2: translated transcription of interview with Defendant (hereinafter "Exh. 2"); (3) Government Exhibit 3: Audio disk of interview with Defendant (hereinafter "Exh. 3").

After consideration of testimony presented, exhibits admitted into evidence and argument of respective counsel, the Magistrate Judge recommends that the District Court grant Defendant's Motion to Suppress Statement (*Miranda* violation).

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Charge

Defendant, along with six co-defendants, is charged with: knowingly and intentionally conspiring from a time unknown to June 23, 2009, at or near State Route 86, near Milepost 63, on the Tohono O'odham Indian Nation, in the District of Arizona, to possess with the intent to distribute approximately 195 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii) and 846 (Count 1); knowingly and intentionally possessing on June 23, 2009, at or near State Route 86, near Milepost 63, on the Tohono O'odham Indian Nation, in the District of Arizona, with the intent to distribute approximately 195 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii) (Count 2); knowingly using and carrying firearms on June 23, 2009, at or near State Route 86, near Milepost 63, on the Tohono O'odham Indian Nation, in the District of Arizona, during and in relation to the drug trafficking crimes alleged in Counts 1 and 2 of the Indictment, crimes prosecutable in a court of the United States, and did possess such firearms in furtherance of such crimes, in violation of 18 U.S.C. §924(c)(1)(A)(I) (Count 3); and being an alien illegally and unlawfully in the United States on June 23, 2009, at or near State Route 86, near Milepost 63, on the Tohono O'odham Indian Nation, in the District of Arizona, while knowingly possessing firearms and ammunition, said firearms and ammunition then being and affecting commerce in that such were previously shipped and transported into the state of Arizona from another state or foreign country, in violation of 18 U.S.C. §§922(g)(5)(A) and 924(a)(2) (Count 4). (Doc. 12).

### B. Factual Background

The Government alleges that on June 23, 2009, Border Patrol agents were conducting "sign cut" operations near Old Guvo Road on the Tohono O'odham Indian Nation, in the District of Arizona. (Doc. 1). Border Patrol agents (hereinafter "BPA") encountered foot sign

1  for a group of individuals. (*Id.*). BPA followed the foot sign for a few miles and requested
2  helicopter air assistance. (*Id.*). Several individuals scattered after seeing the helicopter. (*Id.*).
3  BPA apprehended Defendant along with six others. (*Id.*). BPA found ten bundles of
4  marijuana with a total combined weight of 195 kilograms as well as four firearms in the
5  immediate area. (*Id.*).

6  On June 23, 2009, at 2:00[1] p.m., BPA McCormick read and advised Defendant of his
7  *Miranda* rights in Spanish, and Defendant agreed to talk with BPA McCormick. (McCormick
8  at pp. 12-14; Exh. 1). Defendant's interview was tape recorded. (Exh 3). Defendant was
9  reminded at the beginning of his interview that he was previously advised of his rights. (Exh.
10 2 at p. 1). Defendant was told at the beginning of his interview that "[i]f you want to talk with
11 us, then you need to say that you want to talk with us." (*Id.*). Defendant was also told at the
12 out set of the interview that "[i]f you don't want to talk with us, then tell me that you don't
13 want to talk." (*Id.*). Defendant responded that he did want to talk. (*Id.*). Defendant was asked
14 to sign a Spanish-language *Miranda* rights form indicating that he was willing to talk with
15 BPA McCormick. (*Id.*; Exh. 1). Soon after, Defendant was advised the he "will always have
16 the right to stop with us if you don't want to answer more questions. O.k." (Exh. 2 at p. 1).
17 Defendant was then advised that the interview would be tape-recorded for his and BPA
18 McCormick's protection so that there would be no doubt as to who said what. (*Id.* at pp. 1-2).
19 BPA McCormick then obtained preliminary biographical information from Defendant. (*Id.*
20 at p. 2). Before embarking on substantive questioning of Defendant, BPA McCormick again
21 reminded Defendant that he could terminate questioning at any time:

22 > Q. [BPA McCormick]: O.k. All right. O.k. We are going to ask some questions. We are going to ask some questions with you
23 > and uh *like I told you, if you do not want to talk more just tell me. It's your decision.* But we have a case here that we have to
24

---

25
26  [1]Q.  [Government]: Okay. And do you remember approximately what time of day Mr. Arballo was interviewed? Was it day, was it –
27  A.  [BPA McCormick]: Approximately noon – noonish, 1:00, by the time everyone got in.
28  (McCormick at p. 8).

- 3 -

> talk about because there are things that to me are very serious. O.k.?

(McCormick at pp. 2-3)(emphasis added).

Defendant had stated at the outset of his interview that he was a "pollo"[2] being smuggled into the United States. (*Id.* at p. 3). He reiterated that position again, stating that he and the others he was with were using an alien smuggler. (*Id.* at p. 3). BPA McCormick was disbelieving of Defendant:

> I know that the excuse always, "Oh, I'm a 'pollo.'["] [alien being smuggled[3]] I know. That is an excuse/pretext. I understand the reason, Bro. I understand 100%.

(*Id.* at pp. 7-8). Later in the interview, BPA McCormick stated to Defendant and was answered respectively:

> Q. [BPA McCormick]: But, man- Look, Santiago. I know that everyone has a bag. I know. We followed your/their tracks. I saw, I saw the photos. They saw everything. So Santiago, like like like like I told you that we are talking man to man right now. *It is an excuse/pretext to be a "pollo." No one in that group was a "pollo." All were alien smugglers [polleros[4]]. If they were "polleros," they were guides or pointment [sic]/scouts.* And I think that there is someone who had the guns also. In truth, I don't want to explain something about the guns right now. If it's worth- It- It- It's not important. But for sure without any bag/bundle there was a guide in the group. And one of the things that I want to know the truth, did you have a bag/bundle or were you a guide?
> A. I was not a guide. UI

(*Id.* at pp. 8-9)(emphasis added).  BPA McCormick's immediate response was:

> Q. [BPA McCormick]: *And we are going to change that story of yours.* But it [sic] was saying that with the evidence that we have, for sure, we are going to have an interview with everyone. And we are going to separate everyone, everyone talking.

---

[2]A.  [Defendant]: What can I tell you, that it will be nothing but-I'm just a "pollo" UI [Translator's note: "pollo" refers to an alien being smuggled into the U.S.]. (Exh 2 at p. 1).

[3]This translator's note appears in the original transcript.

[4]This translator's note appears in the original transcript.

- 4 -

1  (*Id.* at p.9)(emphasis added).

2      A fair reading of BPA McCormick's questioning of Defendant indicates his belief that
3  Defendant, and the others that were arrested with him, were carrying bundles of marijuana
4  with firearms for protection against hijackers or robbers. (*Id.* at pp.4-6). BPA McCormick
5  continued in his attempt to prevail upon Defendant that "the people who talk and tell the
6  truth, it's always better. Because the people who lie and lie and lie- ... -how can we have
7  confidence/trust?" (*Id.* at p. 11). The following exchange then occurred:

8          A.[Defendant]: But if I tell you the truth. I will be killed [they will kill me[5]].
9          [*pause*]
        Q. [BPA McCormick]: *O.k. Anything else you want to say?*
10          *A.* [Defendant]: *No. Nothing further. I have nothing to say _*

11  (*Id.* at p. 11) (emphasis added).   Immediately thereafter, BPA McCormick continued with
12  his questioning of Defendant.

13      BPA McCormick testified that Defendant, at no time, invoked his right to stop the
14  interview and remain silent. (McCormick at p. 20).

15  **II. ANALYSIS**

16      **A.    Disk and Transcription**

17      The interview of Defendant was tape recorded by BPA McCormick. (McCormick at
18  p. 11). The tape recording was transferred to an audio disk. (*Id.* at pp. 14-15). The audio disk
19  is admitted as Government Exhibit 3. The tape recording of Defendant was made at a high
20  speed. (*See* McCormick at p. 16). Consequently, the transfer to the audio disk is also at a
21  high speed. The Government informs that this is the best possible recording of Defendant's
22  interview presently available. Government Exhibit 3 lacks any forensic value for
23  consideration.

24      The Government moved to admit, with no objection from Defendant, a translated
25  transcription of Defendant's interview as Government Exhibit 2. (McCormick at pp. 18-19).
26  BPA McCormick, prior to the suppression hearing, reviewed another audio disk with a

27
28      [5]This translator's note appears in the original transcript.

slower recording of Defendant's interview for comparison with Government Exhibit 2. (*Id.* at pp. 14-17). This audio disk has not been made available to the Court.

BPA McCormick opines that Government Exhibit 2 is incomplete in its content in that there are parts indicating inaudible. (*Id.* at p. 18). BPA McCormick also noted similar problems on the disk he used to compare with the translated transcript. (*Id.*). The Government, at the suppression hearing, provided but one example of an incorrect translation in the transcription: reference to a "camera" when, in fact, no videotaping of Defendant's interview occurred. (*Id.* at pp. 18-20). The Government did not maintain that the translation of Defendant's invocation of his right to remain silent is incorrect or that at any time thereafter, Defendant reconsidered.

The Court relies on Government Exhibit 2 in addition to BPA McCormick's testimony for review of what transpired at the interview of Defendant.

### B.     Waiver and Invocation of *Miranda*

It is well-settled law that *waiver of Miranda* rights and *invocation of Miranda* rights are distinct inquiries and must not be made indistinct by their merger. *Smith v. Illinois*, 469 U.S. 91, 98 (1984). *Miranda* insures that one accused is advised and understands the right to remain silent and the right to counsel. *Davis v. United States*, 512 U.S. 452, 460 (1994); *Moran v. Burbine*, 475 U.S. 412, 427 (1986).

Waiver of *Miranda* can be established by either formal or express statements or implied from all the circumstances. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The mere fact that *Miranda* warnings were given and a defendant thereafter made an uncoerced statement, is insufficient to evidence a valid waiver. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966). The Government must make an additional showing that a defendant understood these rights. *Colorado v. Spring*, 479 U.S. 564, 573-575 (1987). Herein, there is no question that Defendant was advised of and understood his rights when he initially proceeded to answer BPA McCormick's questions. This is evidenced by advisement to Defendant of *Miranda* in Spanish; Defendant signing the Spanish-language *Miranda* rights form; Defendant not remaining silent; Defendant himself stating to BPA McCormick that he did want to talk to

him; and Defendant then proceeding to benignly answer questions.

What is also abundantly clear herein, is that Defendant was told that: if he did not want to talk, he did not have to; he had the right to stop answering questions; and he could terminate questioning at any time, i.e., he could *invoke* his right to remain silent at any time after questioning had begun. BPA McCormick testified:

> Q. [Government]: Okay. Did at any time unambig - -did the Defendant unambiguously say that he wanted to invoke his right to silence?
> A. [BPA McCormick]: No, he did not.

(McCormick at p. 25). It has long been held that "no ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." *Emspak v. United States*, 349 U.S. 190, 194 (1955); *see Arnold v. Runnels*, 421 F.3d 859, 866 (9th Cir. 2005)(A defendant is not required to "intone[] some sort of talismanic phrase, such as 'I invoke my right to silence under the Fifth Amendment.'"). It is enough if a defendant states simply and unambiguously that he wants to remain silent or that he does not want to talk. *Berghuis v. Thompkins*, _ U.S. _, 130 S.Ct. 2250, 2260 (June 1, 2010); *Hurd v. Terhune*, _F.3d_, 2010 WL 3293355, *7 (9th Cir. Aug. 23, 2010). Herein, Defendant's statement of "No. Nothing further. I have nothing to say _", when asked if he had anything else he wanted to say, was neither an ambiguous nor an equivocal invocation of his right to remain silent.

BPA McCormick imputes Defendant is referring to being killed, to justify continuing his interrogation of Defendant.[6]

> There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and ... provide[s] guidance to officers" on how to proceed in the

---

[6]Q.   [Government]: Well, let me strike that. That was the - - that was not - - that was a bad question.
   *What was your understanding of what he meant* by - - if you asked him anything else you wanted to say, he says no, nothing further, I have nothing to say, *what did you think he was referring to?*
A.   [BPA McCormick]: *About being killed.*
(McCormick at p. 25)(emphasis added).

- 7 -

face of ambiguity.

*Berghuis,* _ U.S. _, 130 S.Ct. at 2260 (*citing Davis,* 512 U.S. at 458-459). By definition, the objective inquiry examines the clarity of the words spoken by a defendant, rather than the subjective impressions of the officer that would otherwise always trump an unambiguous invocation of the right to silence.[7] Herein, the reasonable words spoken by Defendant unequivocally invoke his right to remain silent. His invocation was not qualified with words such as "maybe" or "might' or "I think." Defendant was clear and unambiguous in his choice of and expression of words.

> Any waiver, express or implied, may be contradicted by an invocation at any time. If the ... right to remain silent is invoked at any point during questioning, further interrogation must cease.

*Berghuis*, _ U.S. _, 130 S.Ct. at 2264-2265.

Once a defendant clearly invokes his right to remain silent, further questioning is permissible only if the defendant's assertion of that right is "scrupulously honored" by law enforcement. In making this assessment, courts consider the totality of the circumstances including such factors as: (1) whether a significant amount of time lapsed between the defendant's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the defendant invokes the right to remain silent and the subsequent interrogation; (3) whether the defendant is given a fresh set of *Miranda* warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the defendant. *Mosley*, 423 U.S. at 104-06.

Herein, the time between Defendant's invocation of his right to remain silent and continued interrogation is negligible. The same officer, BPA McCormick, conducted the interrogation of Defendant before and after Defendant invoked his right to remain silent.

---

[7] "Through the exercise of his option to terminate questioning [the defendant]...can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975).

- 8 -

Defendant was not given a fresh set of *Miranda* warnings before BPA McCormick continued his interrogation. The subsequent interrogation of Defendant concerned the same crime as the interrogation previously cut off by Defendant's invocation of the right to remain silent. *Compare United States v. Moreno-Flores*, 33 F.3d 1164, 1170 (9th Cir. 1994)(invocation of right to remain silent *scrupulously honored* because officer asked defendant only how his night was and defendant initiated conversation about substance of investigation, despite reminder of right to silence); *United States v. Montgomery*, 555 F.3d 623, 633-34 (7th Cir. 2009)(invocation of right to silence *scrupulously honored*: because defendant provided with *Miranda* warnings prior to second interview and officers did not try to undermine defendant's resolve); *United States v. DeMarce*, 564 F.3d 989, 994 (8th Cir. 2009)(invocation of right to silence *scrupulously honored*: defendant provided with *Miranda* warnings before second interview 9 days later and officers did not try to overreach defendant's resistance); *United States v. Lugo Guerrero*, 524 F.3d 5, 12 (1st Cir. 2008)(invocation of right to silence *scrupulously honored*: second interview of defendant conducted 4 hours later by new agent who reissued *Miranda* warnings); *United States v. Alexander*, 447 F.3d 1290, 1297 (10th Cir. 2006) (invocation of right to silence *scrupulously honored*: defendant reinitiated conversation with FBI day after previously invoking right to silence and *Miranda* warnings reissued before second interrogation); *Jackson v. Dagger*, 837 F.2d 1469, 1471-72 (11th Cir. 1988)(invocation of right to silence *scrupulously honored*: police terminated interrogation after each invocation of right, 6 hours elapsed between initial interrogation and confession, and *Miranda* warnings reissued before confession), *with Garvin v. Farmon*, 258 F.3d 951, 954-55 (9th Cir. 2001)(invocation of right to silence *not scrupulously honored* because detective continued questioning defendant after request for attorney)[8]; *United States v.*

---

[8] "... there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel .... Both protect the privilege against compulsory self-incrimination..., by requiring an interrogation to cease when either right is invoked." *Berghuis,* _ U.S. _, 130 S.Ct. at 2260 (citations omitted).

1  *Lafferty*, 503 F3d 293, 304-05 (3d Cir. 2007)(invocation of right to silence *not scrupulously*
2  *honored*: officers placed defendant in interrogation room with alleged accomplice who had
3  previously confessed, and questioned accomplice in defendant's presence); *United States v.*
4  *Rambo*, 365 F.3d 906, 910-11 (10th Cir. 2004)(invocation of right to silence *not scrupulously*
5  *honored*: police did not break interrogation after invocation of right); *McGraw v. Holland*,
6  257 F.3d 513, 518 (6th Cir. 2001)(invocation of right to silence *not scrupulously honored*:
7  after defendant said she did not want to talk about crime she was accused of having
8  participated in, defendant told she must talk about it); *United States v. Ortiz*, 177 F.3d 108,
9  109-10 (1st Cir. 1999)(invocation of right to silence *not scrupulously honored*: two officers
10 each approached defendant, gave *Miranda warnings*, and requested cooperation after
11 defendant requested attorney); *Charles v. Smith*, 894 F.2d 719, 725-26 (5th Cir.
12 1990)(invocation of right to silence *not scrupulously honored*: police asked two potentially
13 incriminating questions minutes after invocation of right); *Campaneria v. Reid*, 891 F.2d
14 1014, 1021-22 (2nd Cir. 1989)(invocation of right to silence *not scrupulously honored*: police
15 told suspect "now is the time to [talk to us]" to change suspect's mind).

16       Herein, once Defendant invoked his right to remain silent, BPA McCormick
17 immediately resumed interrogating Defendant about marijuana, firearms, and facts of the
18 investigation. (Gov. Exh. 2 at pp. 11-19). However, statements made in response to questions
19 after a defendant has invoked his right to remain silent cannot be used to raise doubts about
20 his invocation. *Smith*, 469 U.S. at 96-97.  BPA McCormick went further to tell Defendant:

21         Q.[BPA McCormick]: Now is your only opportuni- What is
        happening is that we are not going to talk again. There [sic] this
22         is your only opportunity to tell me your side of the story.

23 (Gov. Exh. 2 at p. 12). This remark was not aimed at resolving any ambiguity in Defendant's
24 invocation of his right to remain silent, but rather at changing his mind. This is precisely
25 what the rule of scrupulously honoring a defendant's invocation seeks to prevent.

26 **III. CONCLUSION**

27       The Government has met the "heavy burden" to show waiver of Miranda rights with
28 regard to initial questioning. *See Butler*, 441 U.S. at 373 (1994). This "heavy burden" to

- 10 -

establish waiver is by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). However, herein, Defendant affirmatively cut off questioning. Defendant unambiguously and unequivocally retracted his initial waiver and invoked his right to silence. BPA McCormick did not scrupulously honor Defendant's right to remain silent and continued to interrogate Defendant.

## IV. RECOMMENDATION

The Magistrate Judge recommends that the District court grant Defendant's Motion to Suppress Statement (*Miranda* violation) (Doc. 98) and suppress Defendant's statements made after he invoked his right to silence.

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen days after being served with a copy of the Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 09-1539-TUC-DCB.**

Failure to file objections in accordance with Fed.R.Cr.P 59 will result in waiver of the right to review.

DATED this 14th day of September, 2010.

_____
Héctor C. Estrada
United States Magistrate Judge